# In the United States Court of Federal Claims

No. 23-757
Filed: September 12, 2023

---

JAMES W. TINDALL,

          *Plaintiff*,

v.

THE UNITED STATES,

          *Defendant*.

---

*James W. Tindall*, Marietta, GA, *Pro Se* Plaintiff.

*Bryan M. Byrd*, Trial Attorney, Commercial Litigation Branch, Civil Division, *Elizabeth M. Hosford,* Assistant Director, *Patricia M. McCarthy,* Director, *Brian M. Boynton,* Principal Deputy Assistant Attorney General, U.S. Department of Justice, Washington, D.C., for Defendant.

## MEMORANDUM OPINION AND ORDER

On July 21, 2023, Defendant moved to dismiss Plaintiff James Tindall's ("Mr. Tindall") Complaint. (Def.'s Mot. to Dism., ECF No. 8). The Court has reviewed the merits of the pending motion and Mr. Tindall's Response, (Pl.'s Resp., ECF No. 11). Pursuant to RCFC 7.2(b)(2), a reply to a response *may* be filed within fourteen days after service of the response. *Compare* RCFC 7.2(b)(1) ("a response or an objection to a written motion *must* be filed within 28 days after service of the motion . . .") (emphasis added). The Court does not believe that supplemental briefing will assist in this matter, thus a Reply is unnecessary. Mr. Tindall has not established subject-matter jurisdiction with this Court and has failed to adequately state a claim. Accordingly, his Complaint is dismissed.

### I.      Background

In early 2021, President Biden identified Russia's activities[1] as an unprecedented threat to America's security, foreign policy, and economy, and declared a national emergency. Exec.

---

[1] EO 14,024 lists various Russian activities, such as "[e]fforts to undermine the conduct of free and fair democratic elections and democratic institutions in the United . . .; to engage in and facilitate malicious cyber-enabled activities against the United States . . .; to foster and use transnational corruption to influence foreign governments; to pursue extraterritorial activities

Order No. 14,024, 86 Fed. Reg. 20249 (Apr. 15, 2021) ("EO 14,024"). Ten months later, Russia launched a full-scale invasion of Ukraine. *E.g.*, Natalia Zinets & Aleksandar Vasovic, *Missiles Rain Down Around Ukraine*, Reuters, https://www.reuters.com/world/europe/putin-orders-military-operations-ukraine-demands-kyiv-forces-surrender-2022-02-24/ (last accessed Sept. 4 2023). In response, the United States Office of Foreign Assets ("OFAC"), following EO 14,024, issued sweeping sanctions prohibiting any securities transactions involving specified Russian financial institutions. *See Publ'n of Fin. Servs. Sectorial Determination & Directives 1A, 2, 3, & 4 Under Exec. Order* 14,024, 87 Fed. Reg. 32,303, 32,305 (May 31, 2022) (Directive 2).

Charles Schwab & Co., Inc. ("Schwab"), Mr. Tindall's brokerage firm, informed him that sanctions "target[ing] investment in the Russian financial system" encompassed the Public Joint Stock Company Sberbank of Russia ("Sberbank")—a Russian bank of which Mr. Tindall owned 2,400 shares of stock. (Compl. at 1, ECF No. 1; Compl. Ex. A, ECF No. 1-2). On April 26, 2022, Schwab notified Mr. Tindall that OFAC "authorized [share] divestment or transfer to non-U.S. persons until 12:01 a.m. ET on 25 May 2022[,]" approximately one month later. (Compl. Ex. A). The notice stated that after May 25, Schwab would place the "blocked shares into an escrow account for OFAC-authorized transactions only" and clients would "not be able to access these shares without OFAC's permission." (*Id.*).

The day after receiving Schwab's notice, Mr. Tindall penned a letter to President Biden, various federal officials, and Schwab executives referencing Schwab's notice and stating that "Mr. Biden and the entire federal government lack the constitutional authority to take or restrict [his] property" under the Fourth and Fifth Amendments. (Compl. Ex. B, ECF No. 1-3). Mr. Tindall provided the United States with two options to cure its alleged unconstitutional conduct. (*Id.*). He demanded that the United States pay him either "$25/share for the property that [it] illegally took from [him] and [he would] immediately transfer those shares to [the government]," or "$1/share/week for the use of [his] property that [it] illegally took from [him] until such time as [he is] 'allowed' to control [his] property again." (*Id.*). Mr. Tindall informed the United States that it had "until Friday, May 13, 2022, to contact [him] and notify which of the two constitutional methods for using [his] property that [the United States] would to [sic] comply with" and until "Friday, May 27, 2022, to make [its] full (or first) payment." (*Id.*).

When the United States did not respond to Mr. Tindall's letter, he sent another approximately two weeks later. (Compl. Ex. C, ECF No. 1-4). In the second letter, Mr. Tindall acknowledged the United States' failure to pay him and reiterated the two payment options, except this time he added "whichever is greater," and increased his rate for each alleged constitutional right violation from "$1,000,000,000 per violation with cumulative interest" to "$5,000,000 /per violation." (*Id.*). Nearly two weeks later, Schwab informed Mr. Tindall that as of May 25, 2022, U.S. financial institutions, including Schwab, could no longer trade Sberbank and that Schwab placed his shares "into an escrow account from which only OFAC-authorized transactions may be made." (Compl. Ex. D, ECF No. 1-5).

---

targeting dissidents or journalists; to undermine security in countries and regions important to United States national security; and to violate well-established principles of international law, including respect for the territorial integrity of states."

Mr. Tindall sent a third letter on May 29, 2022. (Compl. Ex. E, ECF No. 1-6). Mr. Tindall stated that the United States' "act of taking possession of and exerting control over [his] property evidences [ ] acceptance of his offer at the offered price," and that the United States' "taking of [his] property is sufficient evidence of [its] acceptance of [his] offer" which included "the agreed upon contractual price" of $25/share or $1/share/week, whichever is greater. (*Id.*). He stated that the new deadline for payment was June 10, 2022, after which he would charge the United States "interest at 22.30% on the outstanding amounts retroactive to May 25, 2022." (*Id.*).

Mr. Tindall sent a fourth letter on February 1, 2023. (Compl. Ex. F, ECF No. 1-7). The letter stated that Mr. Tindall was following up on his previous letters and five other letters regarding the demands sent between June and August 2022. (*Id.*). He stated that "[t]o date, [the United States has] willfully declined to respond to any of [his] correspondence about [the United States'] ongoing and continuing illegal and unconstitutional conduct." (*Id.*). He reiterated that the United States' freezing of his shares constituted acceptance of his offer to be compensated under the payment option that would result in greater payment. (*Id.*). Mr. Tindall set a deadline of February 24, 2023 for the United States to pay him and noted that failure to make payment would result in him filing suit in this Court. (*Id.*).

On May 22, 2023, Mr. Tindall filed this Complaint alleging three claims. (Compl. at 1−2). First, he argues that the United States willfully violated his Fifth Amendment due process rights. (*Id.*). Second, he claims the United States knowingly breached an existing contract with him. (*Id.*). And third, he alleges that the United States' actions amounted to an unconstitutional taking of his property without just compensation. (*Id.*). The relief Mr. Tindall seeks is monumental—over $24 billion in damages. (Compl. at 8−9). He demands prompt payment for the United States' possession and control over his 2,400 shares of Sberbank, amounting to approximately $124,800 as of May 19, 2023. (*Id.*). Additionally, he insists on reimbursement for the accrued interest on the outstanding balance owed to him due to the United States' breach, which initially stood at about $28,704, but would continue to grow. (*Id.*). But that's not all. Mr. Tindall seeks justice for violation of his constitutional rights, demanding $5,000,000 for each of the 4,800 violations (two violations per share) that occurred under the Takings Clause and the Due Process Clause of the Fifth Amendment. (*Id.*). In total, this amounts to over $24 billion. The United States moves to dismiss those claims pursuant to RCFC 12(b)(1) and 12(b)(6). (Def.'s Mot. to Dism. at 1).

## II.    Analysis

The Tucker Act is the principal statute governing this Court's jurisdiction. 28 U.S.C. § 1491. The Tucker Act grants this Court jurisdiction over claims (1) founded on an express or implied contract with the United States; (2) seeking refund for a payment made to the government; and (3) arising from federal constitutional, statutory, or regulatory law mandating payment of money damages by the government. 28 U.S.C. § 1491(a)(1); *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc). The Tucker Act, however, is only a jurisdictional statute and does not *create* a substantive right enforceable against the United States. *United States v. Mitchell*, 463 U.S. 206, 216−17 (1983) (quoting *United States v. Testan*, 424 U.S. 392, 400 (1976) (emphasis added)). It merely opens the door for those plaintiffs that can adequately identify and plead their claim in connection with a separate substantive law that "can fairly be interpreted as mandating compensation by the Federal Government." *Id*. In other

words, "because the Tucker Act itself does not create a substantive cause of action, 'in order to come within the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages.'" *Jan's Helicopter Serv*., *Inc*. *v*. *Fed*. *Aviation Admin*., 525 F.3d 1299, 1306 (Fed. Cir. 2008) (quoting *Fisher*, 402 F.3d at 1172). The plaintiff bears the burden of establishing the Court's jurisdiction by a preponderance of the evidence. *Brandt v. United States*, 710 F.3d 1369, 1373 (Fed. Cir. 2013). Under RCFC 12(h)(3), this Court must dismiss an action if it "determines at any time that it lacks subject-matter jurisdiction."

A motion to dismiss for failure to state a claim upon which relief can be granted is governed by Rule 12(b)(6). This rule requires dismissal when a complaint fails to state a "claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl*. *Corp*. *v*. *Twombly*, 550 U.S. 554, 570 (2007). At the pleading stage, the plausibility standard does not impose a probability requirement; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence to support the plaintiff's allegations. *Nalco Co*. *v*. *Chem-Mod*, *LLC*, 883 F.3d 1337, 1350 (Fed. Cir. 2018). Under Rule 12(b)(6) a claim must be dismissed "when the facts asserted by the claimant do not entitle him to a legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002). In evaluating a motion to dismiss, the Court must consider the factual allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party. *Sommers Oil Co*. *v*. *United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001) (citations omitted).

Mr. Tindall claims entitlement to money damages for alleged violations of his due process rights under the Fifth Amendment. (Compl. at 1−2). A "money-mandating" claim "exists if the statute, regulation, or constitutional provision that is the basis for the complaint 'can fairly be interpreted as mandating compensation by the Federal Government.'" *Jan's Helicopter Serv., Inc.*, 525 F.3d at 1307 (quoting *Mitchell*, 463 U.S. at 212). The Due Process Clause of the Fifth Amendment does not mandate the payment of money. *See LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995) (holding the Due Process clauses of the Fifth and Fourteenth Amendments were insufficient for jurisdiction "because they do not mandate payment of money by the government"); *May v. United States*, 534 F. App'x 930, 933 (Fed. Cir. 2013). Because the Due Process Clause is not a money-mandating provision, it does not satisfy the Tucker Act's requirements for this Court's jurisdiction. *Leblanc*, 50 F.3d at 1028 (citation omitted); *Grantham v. United States*, 601 F. App'x 960, 962 (Fed. Cir. 2015); *Bader v. United States*, 160 Fed. Cl. 529, 541 (2022). The jurisdiction of this Court does not extend to Mr. Tindall's Fifth Amendment due process claim.

Mr. Tindall goes on to assert that the United States breached contractual obligations when it did not pay him for its use of his property. (Compl. at 1). This claim also fails. The four elements of a federal government contract are: "(1) mutuality of intent to contract, (2) consideration, (3) lack of ambiguity in offer and acceptance, and (4) authority on the part of the government agent entering the contract." *Seuss v. United States*, 535 F.3d 1348, 1359 (Fed. Cir. 2008). Contract requirements with the United States are the same for both express and implied-in-fact contracts. *Sommers Oil Co*. *v*. *United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001).

Contract law requires "that each party manifest assent with reference to the manifestation of the other." Restatement (Second) of Contracts § 23. It "does not permit one to send unsolicited

letters to the government (or anyone else) declaring that failure to respond to the letter constitutes both formation and breach of a contract." *Ibrahim v. United States*, 799 F. App'x 865, 868 (Fed. Cir. 2020). That is precisely what Mr. Tindall attempts to do. Mr. Tindall claims that his letter was an offer to contract with the United States; but Mr. Tindall's letters went unanswered—his proposed deadlines for acceptance of his offer and payment passed without the United States' reply. (Compl. at 6−8; Compl. Exs. B, C, E, and F). The United States' silence cannot be construed as acceptance of Mr. Tindall's contract offer. *Ibrahim*, 799 F. App'x at 868. Likewise, the United States' failure to pay alleged contractual obligations cannot be considered a breach, as there was no existing contract between the United States and Mr. Tindall. *Id*. In the absence of a valid contract, it is impossible for the United States to breach any contractual obligations. Therefore, the Court must dismiss Mr. Tindall's claim for breach, as it fails to present a valid claim upon which relief can be granted.

Finally, the Court addresses Mr. Tindall's takings claim. The concluding words of our Constitution's Fifth Amendment states that private property shall not "be taken for public use, without just compensation." The Tucker Act empowers this Court to hear claims asserted under the Just Compensation Clause of the Fifth Amendment. *See* 28 U.S.C. § 1491 ("The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress . . ."). However, when a complaint is based solely on unlawful government conduct, the "claimant must concede the validity of the government action which is the basis of the taking claim" for the Court to possess jurisdiction. *Tabb Lakes*, *Ltd*. *v. United States*, 10 F.3d 796, 802–03 (Fed. Cir. 1993); *see also Acadia Tech*., *Inc*. *v. United States*, 458 F.3d 1327, 1329–32 (Fed. Cir. 2006) (holding that in a takings case, the court assumes that the underlying action was lawful and decides only whether the governmental action in question constituted a taking for which compensation must be paid). Moreover, unauthorized acts by federal officials constitute torts, not takings. *See Smithson v. United States*, 847 F.2d 791, 794 (Fed. Cir. 1988); *see also Del-Rio Drilling Programs*, *Inc*. *v. United States*, 146 F.3d 1358, 1362 (Fed. Cir. 1998) ("A compensable taking arises only if the government action in question is authorized."). Mr. Tindall's Complaint explicitly alleges an "unconstitutional" taking of his property several times. (*See*, *e.g*., Compl. at 1; Compl. Ex. B at 2). Because Mr. Tindall contests the lawfulness of EO 14,024 and OFAC's directive requiring that his assets be frozen, he fails to state claim.

To the extent that Mr. Tindall concedes the lawfulness of the United States' action, his Complaint still fails to state claim. The notion that every lawful governmental action resulting in a loss of value to an individual's property necessitates just compensation has long been rejected. *Galloway Farms*, *Inc*. *v. United States*, 834 F.2d 99, 1002 (Fed. Cir.1987) (citing, *e.g*., *Omina Commercial Co*. *v. United States*, 261 U.S. 502, 510 (1923)). The Supreme Court itself has rejected this position as far back as 1870, ruling that actions taken by the United States within the realm of foreign affairs—such as tariffs and embargos—that reduced or destroyed the value of an individual's property, do not trigger the Takings Clause. *Legal Tender Cases* (*Knox v. Lee*), 79 U.S. 457, 551 (1870). The Federal Circuit acknowledged that the principles articulated in *Knox* remain valid despite significant changes in takings law since 1870, particularly concerning governmental actions in the sphere of foreign relations. *B-West Imports*, *Inc*. *v. United States*, 75 F.3d 633, 638 (Fed. Cir. 1996) (rejecting the claim that revocation of the plaintiff's license to import arms from China constituted a taking).

There are factual similarities to *Paradissiotis v. United States*, where the Federal Circuit rejected a similar claim based on a loss of stock options that occurred while the appellant's assets were frozen due to OFAC's sanctions against Libya. 304 F.3d 1271, 1275 (Fed. Cir. 2002). The Federal Circuit reasoned that "[v]alid regulatory measures taken to serve substantial national security interests . . . have not been recognized as compensable takings for Fifth Amendment purposes." *Id*. "As applied to economic sanctions such as orders blocking transactions and freezing assets," the Federal Circuit continued, "that principle disposes of any suggestion that the United States could freeze [foreign] assets in this country only of it were prepared to pay the cost of any losses resulting from the freeze." *Id*.

Here, the United States' actions taken pursuant to an executive order serve a substantial national security interest.[2] *See* Exec. Order No. 14,024. Mr. Tindall alleges that the sanctions effect "economic retaliation against Russia for its invasion of Ukraine." (Compl. at 1). More specifically concerning the United States' national security however, in implementing EO 14,024 by imposing sanctions on Russian financial institutions, OFAC explained that President Biden had found that "specific harmful foreign activities of the Government of the Russia Federation . . . constitute an usual and extraordinary threat to the national security, foreign policy, and economy of the United States and declared a national emergency to deal with that threat." 87 Fed. Reg. 32,303. Further, in *Paradissiotis*, the appellant conceded that the act of restricting his assets did not establish a valid takings claim. 304 F.3d at 1274. Instead, he contended that even though the act of freezing of his assets was lawful, OFAC should have allowed him to exercise his stock options and subsequently held the resulting funds in a blocked account that accrues interest. *Id*. He argued that the failure to pursue this approach constituted a compensable taking. *Id*. Here though, Schwab notified Mr. Tindall on April 26 that the freeze would commence twenty-nine days later, on May 25, and that OFAC had "authorized divestment or transfer to non-U.S. persons" until then. (Compl. Ex. A). Therefore, even if Mr. Tindall did not contest the validity of the United States' actions, he still fails to state a takings claim because the United States' actions served a substantial national security interest.

### III.   Conclusion

Mr. Tindall has either not carried his burden or failed to adequately state a claim. Consequently, the United States' Motion to Dismiss, (ECF No. 9), is **GRANTED**. The Clerk **SHALL** enter judgment accordingly. The Clerk is also **DIRECTED TO REJECT** any future submissions in this case unless they comply with this Court's rules regarding post-dismissal submissions.

**IT IS SO ORDERED.**

_David A. Tapp_
DAVID A. TAPP, Judge

---

[2] This Opinion does not endorse the notion that *any* invocation of "national security" is sufficient to overwhelm the Fifth Amendment's takings clause.